**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| LUTHER GRAHAM, | ) | |
| | ) | |
| *Plaintiff*, | ) | Civil Action No: |
| v. | ) | 16-cv-01578 (PGS) |
| MONMOUTH COUNTY BUILDINGS | ) | |
| AND GROUNDS, | ) | **MEMORANDUM AND** |
| DAVID KRZYANOWSKI, | ) | **ORDER** |
| ROBERT W. COMPTON, | ) | |
| and CRAIG BELL, | ) | |
| | ) | |
| *Defendants*. | ` | |

This matter is before the Court on Defendants' motions for summary judgment. (ECF No. 36, 43, 35, 38).

### I.

Plaintiff Luther Graham is a Senior Electrician employed by Monmouth County Buildings and Grounds Department ("County"). (First Amended Complaint ("FAC") ¶ 15, ECF 22).  On March 22, 2016, Plaintiff brought a claim against his employer, Defendant Monmouth County Buildings and Grounds for Monmouth County, New Jersey ("Defendant County"); Aaron Kinney (Plaintiff's direct supervisor), Craig Bell (Kinney's supervisor and General Supervisor);[1] David Krzyanowski (Supervisor of General Services, and Bell's supervisor); and Robert Compton (Superintendent and Krzyanowski's supervisor).

Plaintiff alleged various counts. His first count asserted violations of 42 U.S.C. § 1981 ("Section 1981") for racial discrimination, retaliation for complaining of racial discrimination and hostile work environment because of his race and/or because of his complaints of race

---

[1] In late January 2015, James Shirley took over Defendant Bell's supervisory responsibilities strictly as to Kinney's trade unit only. (Bell SOF ¶ 16, ECF 38-1).

discrimination against all Defendants. Plaintiff's second claim asserted violations of the New Jersey Law against Discrimination ("NJLAD") for racial discrimination, retaliation for complaining of racial discrimination and hostile work environment because of his race and/or because of his complaints of race discrimination against all Defendants. (Compl. at 6; ECF 1).

On July 18, 2016, once his administrative remedies were properly exhausted, Plaintiff filed his First Amended Complaint to include a third count for violations of Title VII of the Civil Rights Act of 1964 ("Title VII") for racial discrimination, retaliation for complaining of racial discrimination, and hostile work environment because of his race and/or because of his complaints of race discrimination against the County only. (FAC ¶ 6, ECF 22).

On April 11, 2017, Plaintiff voluntarily dismissed his claims for racial discrimination and hostile work environment based upon race. (Bell SOF ¶ 8; ECF 38-1). The claims that remain for the Court's review are claims for Retaliation and Retaliatory Hostile Work Environment, both under federal and state law.

The Amended Complaint consists of 19 paragraphs of alleged facts, depicting various incidents of alleged discrimination, retaliation, and hostile work environment in support of the above mentioned counts.

II.

Generally, Plaintiff is a 50 years old African-American man who began his employment with the County Buildings and Grounds Department on or about 2004 in the position of Electrician.[2] (FAC ¶ 14-15). In August of 2007, the County promoted Plaintiff to Senior

---

[2]     The documents provided by the parties report different dates as the beginning of Plaintiff's employment with the County.  The first amended Complaint states that "Plaintiff was hired by Defendant County in or about 2004… as a senior electrician and remains employed as one to this day." (FAC ¶ 14-15). However, Defendant Krzyanowski's statement of undisputed facts states that Plaintiff began working for the County in 1994 in the Division of Employment

Electrician. (County SOF at ¶ 4). Plaintiff remains in the position of Senior Electrician in the Monmouth County Buildings and Grounds Department. (FAC at ¶15, ECF 22).

As best this Court understands it, Plaintiff is alleging that its employer's discriminatory, retaliatory and hostile actions, began following complaints he filed in 2015. Specifically, Plaintiff alleges filing a complaint to management on February 2, 2015 for selective enforcement of the attendance and other policies against him (FAC ¶17); Plaintiff also alleges filing another complaint on March 12, 2015 for discrimination (Id. ¶20), and on October 1, 2015 for discrimination and retaliation. (FAC ¶29).  For clarity, the Court has reorganized the events alleged by Plaintiff in chronological order.

### Construction Project Coordinator Position

Plaintiff alleges that he was not hired for the position of construction project coordinator in retaliation to the complaints filed with his employer.  On October 10, 2013, Defendant Compton approved the posting[3] for an anticipated vacancy for the Construction Project Coordinator position. (Compton SOF ¶ 22; ECF 35-2). The vacancy was "anticipated" because the position was filled at that point by another employee named Walter Gawron, who had expressed that he may retire in 2014. (County SOF ¶ 33, ECF 36-5).  Plaintiff alleges that he was not granted an interview for the Project Coordinator position. (Graham SOF ¶ 24; ECF 45-1); however, Plaintiff along with three other County employees were interviewed for the position on January 28, 2015. *Id*. Although the County eventually narrowed down the applicants to Plaintiff and one other individual, nobody was

---

and Training. In 2005 he because an Electrician with the County's Division of buildings and Grounds. (ECF No. 43-1 ¶1-2) The County's statement of undisputed facts state that "On March 7, 2005, Plaintiff commenced his employment in the Monmouth County Buildings and Grounds Department in the position of Electrician. (ECF No. 35-2 ¶2). The Court narrates the facts as stated in the amended complaint noting any additional information from other documents accordingly. (ECF No. 22).

[3]    The County's hiring process must follow civil service requirements and the County Administrator must approve all job postings and decisions. (Krzyanowski SOF ¶ 44, ECF 43-1).

hired because Walter Gawron never retired. (Compton SOF ¶ 23;¶ 33-35). The job posting was ultimately abandoned. (County Br. at 16, ECF 36-2).

### **"Get rid of Luther" Comment**

On March 12, 2015, Plaintiff filed a written complaint with the County, alleging that he was being discriminated based on his race by Defendants Bell, Compton, and Krzyanowski. (FAC ¶ 19-20). Graham claims that because he filed the complaint, Defendant Krzyanowski told Kinney that he wanted to "get rid of" him; and he was very angry that Plaintiff "had gone to Personnel", and asked something along the lines of "who was Luther [Graham] to question us." (Graham Br. at 15; ECF 45; Graham SOF at 5, ECF 45-1).

### **Assistant Building & Maintenance Supervisor Positions**

Plaintiff alleges that a number of discriminatory and retaliatory actions followed in April 2015. Graham alleges "For example, in or about April of 2015, Defendants management pretexually denied Plaintiff the opportunity to interview for a promotion to Assistant Building & Maintenance Supervisor" on two occasions, and that the promotions were subsequently given to less qualified, nonblack applicants. (FAC 23-24). The County posted these two positions on December 18, 2014.

> 1. *Assistant Supervising HVAC Mechanic*.

Plaintiff alleges that he was unable to apply for the Assistant Building and Maintenance Supervisor position because it was posted on December 18, 2014, as an Assistant Supervising HVAC Mechanic position. (County SOF ¶ 31, ECF 36-5). Essentially, Plaintiff argues that Defendants Compton, Bell, and Krzyanowski manipulated these job postings to exclude him from applying for higher positions in retaliation for his filing complaints. (Graham SOF ¶ 18, ECF 45-1). However, this position required applicants to hold the title of Heating and Air conditioning

Mechanic, which Plaintiff did not hold. Thus, it appears that he was unable to apply because he did not qualify for the positon. (County SOF ¶ 31; ECF 36-5).

### 2. *General Supervisor of Building Services.*

Plaintiff lacked required qualifications for the General Supervisor of Building Services position as well, because as he admitted that Plaintiff did not have a promotional title in building services. (County Br. at 17; ECF 36-2; *see also* County SOF ¶36; ECF 36-5).[4] The person who obtained the position, Scott Griffin, held such a title within the Building Services promotional title chain. (Defendant County Br. at 17; ECF 36-2).

### **Notices of Lateness**

On or about April 30, 2015[5], Graham again complained in writing to Defendant of "on going harassment," and alleging that he was subjected to repeated retaliatory and discriminatory actions because Defendants pretextually denied him the opportunity to interview for a promotion to Assistant Building and Maintenance Supervisor. (County SOF at ¶ 14, ECF 36-5; See FAC at ¶ 21-22, ECF 22). On or about May 1, 2015 James Shirley, who took over Defendant Bell's position as General Supervisor in January 2015, issued Plaintiff a performance notice for lateness because Plaintiff had clocked in late ten times from January to April 29, 2015.[6] (Bell SOF ¶ 21, ECF 38-1; *Id.* at ¶ 20). Plaintiff alleges that "Defendant Individuals […] issued Plaintiff pretextual discipline in or about April of 2015" (FAC ¶25). "Specifically, Plaintiff was disciplined for being mere seconds late in or about April of 2015." (FAC ¶26). Plaintiff alleges that the disciplinary action was issued in retaliation of his complains. (Graham SOF ¶ 19; ECF 45-1). Defendant contests whether the complaint was received before the notice was issued. Further, Defendant Compton

---

[4]     It is unclear when the General Supervisor position was posted.
[5]     The Amended Complaint does not mention this date specifically as one of the complaints filed by Plaintiff.
[6]     Defendant County asserts that the County also issued Plaintiff a performance notice for lateness in 2011. (County SOF ¶ 8, ECF 36-5).

testified that lateness is not checked every day but rather is part of an audit that is done on the entire staff at once. (County SOF ¶ 22; ECF 36-5). As a result of the May 2015 audit, "multiple" employees were given notices of counseling for lateness. (*Id*. at 23.) Plaintiff was included in that class, as one of approximately 25 employees who were given counseling notices as a result of being late. *Id*.

### EEOC Complaint

On June 18, 2015, Plaintiff filed a written complaint with the County. (*Id*. at ¶ 26). On July 30, 2015, Graham filed a charge of employment discrimination with the EEOC and the New Jersey Division on Civil Rights. (*Id*. at ¶ 15). The County responded to Plaintiff's February 2, March 12, April 30, and June 18, 2015, complaints in writing on August 5, 2015. (*Id*.) The County noted that it investigated Plaintiff's complaint that he was denied an interview for the position of Project Manager and concluded that the County interviewed Plaintiff on January 28, 2014. (*Id*.)  The County also concluded that Kinney denied that Defendant Krzyanowski used the phrase "get rid of" referring to Plaintiff, and admitted that that was only his interpretation of what Krzyanowski had said to him. (*Id*. at ¶ 17). Plaintiff acknowledged receipt of the County's written response to his three complaints and admitted that the County's response answered his complaints. (*Id*. at ¶ 16).

### "Driving Miss Daisy" Comment

Since at least 2013, Plaintiff rode with Defendant Kinney, Plaintiff's direct supervisor, to jobs about two to three times per week because Kinney started relying on him in more of a leadership role. (*Id*. at ¶ 10). Kinney acknowledged that Plaintiff's new leadership role caused problems with the staff and that he received complaints about Graham not doing his work. (*Id*. at

¶ 11). On March 6, 2013, Defendant Bell advised Kinney that if Kinney needed down time, he "shouldn't be riding around with [Plaintiff]." (*Id*. at ¶ 12).

On September 15, 2015, Defendant Kinney told Plaintiff that they were no longer allowed to ride to jobs together in the same vehicle. (FAC at ¶ 27, ECF 22). In the Complaint Plaintiff alleges that Defendants referred to him and Kinney riding together in a vehicle as "Driving Ms. Daisy." (FAC at ¶ 28). In his finding of facts, Plaintiffs adds more details to this specific instance stating that he supports that he is the only electrician forced to never ride with his supervisor and argues that this occurred ever since him and Kinney complained about Krzyzanowski referring to the pair as "Driving Ms. Daisy."[7] (SOF ¶ 26 (a), ECF 45-1) Kinney is Caucasian and Plaintiff is African-American. *Id*. Defendants dispute who among them made this statement first. (SOF ¶ 26, ECF No. 45-1). On the same day, Plaintiff requested reconsideration of the County's findings in its August 5, 2015, letter response to Plaintiff's three previous complaints. (Id. at ¶ 27). The County responded in writing on September 24, 2015. (*Id*.) Plaintiff received the letter and then appealed the County's September 24, 2015 response to the Civil Service Commission on September 30, 2015. (*Id*.).

On October 1, 2015, Plaintiff filed a written complaint with the County, alleging he was being subjected to discrimination and retaliation. (FAC at ¶ 29, ECF 22). Plaintiff alleged that he had not been considered for any promotion positions, his complaints of discrimination had not been properly investigated, and he continued to be subjected to a hostile work environment based on racial discrimination and retaliation for complaints of discrimination. (*Id*. at ¶ 30-31).

---

[7]     The Complaint does not mention the date when that statement was made.

Defendant County responded to this complaint on February 10, 2016, and Plaintiff received this letter. (*Id*. at ¶ 28-29).

### Supervising Maintenance Repair Position

Plaintiff applied for a Supervising Maintenance Repair Position which was posted as an anticipated vacancy on or about March 8, 2016. (County SOF ¶ 42; ECF 36-5). However, Defendant Compton abandoned this job posting because Human Resources informed him that if he hired someone for this position, another County employee would be laid off. *Id*.

### Crew Supervisor—Building Maintenance Position

Plaintiff also applied for the Crew Supervisor—Building Maintenance position that was posted as an anticipated vacancy on or about March 8, 2016. (Defendant County Br. at 19; ECF 36-2). Graham was interviewed for the position. (County SOF ¶43; ECF 36-5). However, another candidate, Robert Briscoe, was hired. Defendant Compton supports that the other candidate simply had a better interview, thus was awarded the position. *Id*. Parties have not provided any records regarding Briscoe's qualifications.

### Management Assistant Position

Plaintiff alleges that he was not hired for a Management Assistant position and someone less qualified was. Defendants submit that a Management Assistant position was posted on July 15, 2016. Plaintiff was interviewed for the Management Assistant position and that "Graham was dismayed that the position would have been a demotion and a pay cut from what he was earning as a Senior Electrician." (County SOF ¶ 37, ECF 36-5).

### Parking Notice

Plaintiff does not specifically mention an issue with parking in the Complaint, though he mentions receiving notices. On November 29, 2016, Plaintiff received a performance notice for

parking a county vehicle in a handicapped parking space. (County SOF ¶ 38; ECF 36-5). The notice was issued after Defendant Compton observed the vehicle parked in the handicapped parking spot and instructed James Shirley to issue a performance notice to whomever parked in the handicapped space. (County Br. at 23-24; ECF 36-2). The performance notice stated it was "a supervisory tool only and is not recognized as any form of discipline." (County SOF ¶ 38; ECF 36-5). Defendant Compton testified that he did not have any conversations with Plaintiff about the issue because "it was just a performance notice, like I said. It wasn't discipline. It was to put him on notice that his behavior was unacceptable." (*Id*. at ¶ 39). Plaintiff alleged that the notice was one of multiple retaliatory acts by Defendants Bell and Compton. (Graham Br. at 29; ECF 45).

Parking in a handicapped space without a valid permit is against New Jersey Law. N.J.S.A. 39:4-197.

### Relief Requested

Plaintiff, raised the above instances in his Complaint, now asks this Court to enter an Order prohibiting the Defendants from continuing to maintain their illegal policy, practice or custom of discriminating against employees and ordering the Defendants to promulgate an effective policy against discrimination and retaliation. Second, Plaintiff also seeks that this Court make him whole again and order Defendants to pay him what he would have received had it not been for Defendants' illegal actions[8], including but not limited to past lost earnings, future lost earnings, salary, pay increase, bonuses, medical and other benefits, training, promotions, pension, and seniority. Third, Plaintiff seeks punitive damage and/or liquidated damages. Fourth, Plaintiff seeks damages for emotional distress and/or pain and suffering and any all other equitable and legal relief as the Court deems just, proper, and appropriate. Fifth, Plaintiff seeks reimbursement of costs

---

[8] Assuming he would have been hired for the positions he applied for.

and expenses of this action and reasonable legal fees as provided by applicable law. (FAC at ¶6-7, ECF 22).

III.

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial"). Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary

judgment. *Anderson*, 477 U.S. at 247-48. If a court determines, after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in his favor "that no reasonable jury could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 Fed. App'x. 222, 227 (3d Cir. 2007).

IV.

I.     Retaliation under Title VII, 42 U.S.C. § 1981, 42 U.S.C. § 1983, and the New Jersey Law Against Discrimination ("NJLAD").

> (<u>Count I</u>: *Violation of 42 U.S.C. § 1981 for retaliation for complaining of racial discrimination*) (against all Defendants)

> (<u>Count II</u>: *Violation of NJLAD for retaliation for complaining of racial discrimination*) (against all Defendants)

> (<u>Count III</u>: *Violation of Title VII for retaliation for complaining of racial discrimination*) (against Defendant Monmouth County Buildings and Grounds)

Title VII of the Civil Rights Act provides as follows:

> It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

[42 U.S.C. § 2000e-3].

Moreover, 42 U.S.C. § 1983 mandates as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or

declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

[42 U.S.C. § 1983].

Similarly, the NJLAD provides as follows:

> It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination . . . [f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified or assisted in any proceeding under this act or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act.

[N.J.S.A. 10:4-12(d)]

Under 42 U.S.C. § 1981, all persons are able to "make and enforce contracts" and are "protected against impairment by nongovernmental discrimination and impairment under color of State law." An individual may be liable under § 1981, if the plaintiff demonstrates "some affirmative link to causally connect the actor with the discriminatory action . . . [P]ersonal liability under section 1981 must be predicated on the actor's personal involvement." *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004).

The burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), for cases arising under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq., also applies to claims arising under § 1981. *See Est. of Oliva ex rel. McHugh v. State of N.J.*, 604 F.3d 788, 798 n. 14 (3d Cir. 2010). First, plaintiff must establish a prima facie case of discrimination by showing by a preponderance of the evidence that: (1) plaintiff is a minority; (2) plaintiff applied for, is qualified for, and was rejected for the position sought; and (3) non-members

of the protected class were treated more favorably. *McDonnell Douglas*, 411 U.S. at 802. The

defendant may then rebut the discriminatory presumption by showing there was a "legitimate,

nondiscriminatory reason" why the employer preferred another employee. *Id.* If the defendant

successfully rebuts the discriminatory presumption, then the burden shifts back to the plaintiff,

who must show that the reasons proffered by the defendant are pretextual. *Id.* at 804.

To survive summary judgment, plaintiff must come forward with sufficient evidence to

establish a prima facie case. To that end, plaintiff must demonstrate that he:

1. Was engaged in a protected activity;
2. Suffered an adverse employment decision; and
3. There was a causal connection between the two.

*Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001). The analysis for Section 1983 claims and

NJLAD claims are almost identical to the test enumerated in *Cardenas*. *See Rauser v. Horn*, 241

F.3d 330, 333 (3d Cir. 2001).

Under the first prong, examples of protected activities include filing complaints and/or

lawsuits alleging discrimination. *See Sgro v. Bloomberg L.P.*, 331 Fed. Appx. 932, 939 (2009).

Under the second prong, "a plaintiff must show that a reasonable employee would have found the

challenged action materially adverse, which in this context means it well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*,

548 U.S. at 68. An adverse employment action is also one which is "serious and tangible enough

to alter an employee's compensation, terms, conditions, or privileges of employment," "which

would tend to deprive [the employee] of employment opportunities or otherwise affect [the

employee's] status as an employee." *Cardenas*, 269 F.3d at 263 (quoting *Robinson v. Pittsburgh*,

120 F.3d 1286, 1300 (3d Cir. 1997); *Burlington Northern*, 548 U.S. at 68)). Lastly, a determination

of whether there was a materially adverse employment action requires an analysis of the

employer's actions in the aggregate. *See Brennan v. Norton*, 350 F.3d 399, 422, n.17 (3d Cir. 2003)

(stating that "[t]he cumulative impact of retaliatory acts may become actionable even though the actions would be de minimis if considered in isolation.")

In elaborating on the standard, the United States Supreme Court recognized "Title VII does not set forth 'a general civility code for the American workplace.'" *Burlington Northern,* 548 U.S. at 68 (quoting *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80 (1998). "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern,* 548 U.S. at 67 (internal quotations omitted). "Trivial harms," "petty slights" and lack of good manners on the part of co-workers are insufficient to establish an adverse employment action. *Id.* at 68.

To determine whether conduct was retaliatory, courts have focused on two factors: (1) the temporal proximity between the protected activity and the alleged discrimination, and (2) the existence of a pattern of antagonism in the intervening period. *Jensen v. Potter*, 435 F.3d 444, 450 (3d. Cir. 2006). For timing alone to raise an inference of discrimination, it must be "unusually suggestive of retaliatory motive" *Id*. Courts will also evaluate the evidence in totality to determine whether it gives rise to an inference of discriminatory conduct. *Id.*

II.     Hostile Work Environment under Title VII, 42 U.S.C. § 1981, 42 U.S.C. § 1983, and the New Jersey Law Against Discrimination.

>       (Count I: *Violation of 42 U.S.C. § 1981 for hostile work environment because of Plaintiff's complaints of race discrimination*) (against all Defendants)

>       (Count II: *Violation of NJLAD for hostile work environment because of Plaintiff's complaints of race discrimination*) (against all Defendants)

>       (Count III: *Violation of Title VII for hostile work environment because of Plaintiff's complaints of race discrimination*) (against Defendant Monmouth County Buildings and Grounds)

A prima facie case of hostile work environment requires plaintiff to establish the following criteria:

(1) Plaintiff suffered intentional discrimination because of her protected activity;
(2) The discrimination was severe or pervasive;
(3) The discrimination detrimentally affected him or her;
(4) The discrimination would have detrimentally affected a reasonable person in like circumstances; and
(5) A basis for employer liability is present.

*Jensen v. Potter*, 435 F.3d 444, 450 (3d. Cir. 2006). In assessing whether conduct is severe or pervasive, courts consider the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). However, in considering the totality of the circumstances, courts filter out "simple teasing, offhand comments, and isolated incidents." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Plaintiff claims that there can be little doubt that being precluded from traveling with his supervisor for work purposes, being singled out for disciplines by members of upper management immediately following complaining of discrimination, being told upper management may disfavor Plaintiff from communicating with human resources, and threatening disciplinary action for asserting written complaints of race discrimination, all constitute a factual question as to a retaliatory "hostile work environment." (Graham Br. at 26; ECF 45). Moreover, Plaintiff supports that he has proffered plenty of evidence that a factfinder could easily disbelieve Defendants' proffered reasons for these retaliatory acts. *Id*. Therefore, he requests this Court to deny dismissal of his retaliatory/hostile work environment claim. *Id*.

V.

As an initial matter, the Court reviews Plaintiff's general allegations that Defendant County failed to fully investigate his complaints to HR. (Compl. at ¶ 30; ECF 22). Plaintiff concludes that Defendant County's intentionally conducted poor investigations as retaliation against Plaintiff for his complaints. *Id.*

Defendant County responded to Plaintiff's February 2, March 12, and April 30, 2015 complaints in writing on August 5, 2015. (County SOF ¶ 16; ECF 36-5). The letter stated that an investigation was conducted. *Id.* Further, Plaintiff's June 18, 2015 complaint was investigated and the County responded on October 15, 2015. (*Id.* at ¶ 26). Lastly, Plaintiff's October 1, 2015 complaint was investigated and the County responded on February 10, 2016. (*Id.* at ¶ 28).

First, Defendants maintain that Defendant County's August 2015 investigative response does not constitute an "adverse action" for purposes of a retaliation claim. *Id.* Pursuant to Defendant County's policy, employees are encouraged to promptly report incidents of perceived discrimination to HR. (Defendant County's Reply at 8; ECF 49). Once a complaint is registered, an investigation will be conducted. *Id.* Defendant County stresses that it is not obligated to believe Plaintiff's complaint or to find in Graham's favor merely because Plaintiff filed a complaint in the first place. *Id.* Defendant County further argues that Plaintiff was not dissuaded from filing subsequent complaints simply because the claims in his earlier complaints were ultimately rejected. *Id.*[9]

---

[9] In fact, Plaintiff filed two more complaints after Defendant County's August 2015 response: one on June 18, 2015, and one on February 10, 2016. (Defendant County Stmt. of Facts ¶ 26-28; ECF 36-5).

Second, Defendants submit that Defendant County investigated Plaintiff's complaints and Plaintiff, in turn, admitted that Defendant County's August 2015 response was responsive to his complaints. *Id*. at 9. Defendants argue that even if this Court finds that Defendant County's response is a retaliatory adverse action, Defendant County had a non-discriminatory reason for its response because the County's Personnel Department could not substantiate the allegations in Plaintiff's complaints. *Id*.

Lastly, Defendants argue that the County's August 2015 response was not pretextual because Plaintiff has only shown that there was a disagreement between Defendant County's Personnel Department and Plaintiff over whether Plaintiff was interviewed for the Project Coordinator position. *Id*. Defendant County's response noted that its investigation disclosed that Plaintiff was interviewed for this position. *Id*. Therefore, Defendants emphasize that there is no evidence that Defendant County retaliated against Plaintiff via its August 2015 response to Graham's complaints. *Id*. This Court agrees.

Next, the Court reviews the incidents that allegedly constituted evidence of retaliation and hostile work environment.

Discovery, and additional facts provided by the parties have clarified some but not all the instances alleged by Plaintiff. Applying the legal standards mentioned above the Court finds that Defendant has provided sufficient information to show that the instances raised by Plaintiff were not pretext for discrimination. Additionally, Plaintiff failed to show a prima facie case for some of the occurrences. For instance, Plaintiff's notice of lateness was the result of a periodic check conducted by Defendants. Plaintiff was one among 25 employees to receive a notice. Further, Plaintiff did not deny being late. He simply found the notice unfair because he was "mere seconds" late. Lastly, as explained by Defendants, the performance notice was not an adverse employment

action. (County Br. at 20-22; ECF 36-2).  Plaintiff has not identified any diminution in salary, demotion, or loss of benefits in his testimony as a result of the performance notice for lateness. (County Br. at 21; ECF 36-2).

Another blatant example of mere policy enforcement is the parking notice that Plaintiff received in 2016 for parking in a handicap parking space.  Plaintiff's behavior was against the law. The employer had a right to notify Plaintiff. Thus, a notice with regards to this infraction cannot support a claim for retaliation.

With regards to the employment promotions Plaintiff did not receive, the Court is satisfied with the additional facts as provided by Defendants for most of the positions discussed.  Plaintiff may not allege retaliation for positions that were never filled, or for which he did not possess the required qualifications.  Nevertheless, the same is not true for the Crew Supervisor position, posted on March 18, 2016, for which Plaintiff was interviewed but not hired.

With regards to that position, Defendants only justified not hiring Plaintiff because they interviewed a better candidate. Parties did not provide evidence that the individual that was hired was more or less qualified. Therefore, the Court does not have sufficient information to make a determination of whether this constituted a retaliatory or hostile action.

The remaining two incidents described by Plaintiff consist of statements that were allegedly made by Defendants.

First, the "get rid of" him statement. Plaintiff cannot rely on the assertions he made in his complaint to survive a summary judgment motion. *See Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195 (3d. Cir. 2006). (Defendant County Br. at 24-26; ECF 36-2). Graham admitted in his deposition that he was not present when Defendant Krzyanowski allegedly stated that he wanted to get rid of him. *Id*. at 25. Defendants, on the other hand, argue that this comment was made

before Graham filed a complaint. (County SOF ¶ 19-20; ECF 36-5). On the same date, Plaintiff filed an Unfair Labor Practice Charge with the New Jersey Public Employment Relations Commission. (*Id*. at ¶ 13). Plaintiff also admitted that Kinney told Plaintiff about this statement. *Id*. In turn, Kinney testified that Defendant Krzyanowski did not state that he wanted "to get rid of" Plaintiff. *Id*. Kinney was the sole witness to Defendant Krzyanowski's second alleged statement of "Who is Luther to question us?" *Id*. Kinney, however, did not attribute this statement to Defendant Krzyanowski in his deposition. *Id*. at 26. Lastly, Krzyanowski's statement that he was angry at Plaintiff for going to the County's Personnel Department was connected to a paycheck issue in 2005, not about Plaintiff's March 12, 2015 complaint. (Defendant County Reply at 5; ECF 49). Therefore, the record appears to be devoid of any evidence that shows Defendants openly threatened Plaintiff's job security because Plaintiff filed a complaint with the County.

The last incident involves Plaintiff's prohibition against riding in the car with Kinney and the "driving Ms. Daisy" statement allegedly made by Defendants. Plaintiff claims that he was told that he could not ride with Kinney in the same work truck on September 15, 2015, or sometime after he submitted his rebuttal to Defendant County's response to his complaints. (FAC at ¶ 27, ECF 22).

The Court fails to see how being told not to ride around in a truck with his supervisor constitutes an adverse employment action. (Defendant County Reply at 10-12; ECF 49). Plaintiff suffered no diminution of salary or benefits from this action. (County Br. at 27; ECF 36-2). He simply had to take his own truck to the applicable job site. *Id*. Plaintiff supports that he was the only one who was not allowed to ride in a car with his supervisor in retaliation to the complaints he filed. However, as far as the Court can tell, this statement is conclusory and uncorroborated. The testimony of Kinney and Defendant Krzyanowski confirms that Kinney was directed to stop

riding around with Plaintiff because he was spending too much time not doing his own work and that it was causing the other electricians to complain. (County SOF ¶ 11; ECF 36-5).

Additionally, Defendants contend that there is no causal link to Plaintiff's September 15, 2015 complaints because the concerns surrounding Kinney and Plaintiff riding to jobs together date to at least 2013. (Defendant County Br. at 26-29; ECF 36-2). Defendants also argue that Plaintiff was aware that driving with Kinney was an issue before his September 15 complaint.  In fact, Kinney testified that he told Plaintiff several times they could not ride together. Plaintiff also testified during his deposition that Kinney told him that Bell did not like them riding together; and Plaintiff further testified that employees Desiato and Quade also told him before September 15 that Bell was going to "stop the togetherness." *Id.*

Plaintiff also alleges that "Defendant individuals referred to Plaintiff (African-American) and Kinney (Caucasian) riding in a vehicle together as 'Driving Miss Daisy.'" (FAC ¶ 28, ECF 22).  It is unclear who made the comment or who said it first among Defendants.  It remains that Plaintiff voluntarily dismissed the claims for racial discrimination. The remaining occurrence based on these facts focuses on his prohibition from driving in the same truck with Kinney.

Overall, Defendants met their burden by explaining that the incidents raised by Plaintiffs were not guided by retaliatory motive nor did they constitute hostile action due to his complaints, in all but one instance.  Due to the lack of support and facts, the Court cannot grant summary judgment on the instance involving Plaintiff's application to the Crew supervisor position. Explaining that another applicant interviewed better is not sufficient to defeat a retaliation allegation.

Plaintiff brings claims against the County, as well as individual Defendants under Title VII, 42 U.S.C. §1981, §1983, and NJLAD. "[T]his Circuit has held that Title VII claims cannot be

brought against individual employees." *White v. Cleary*, 2012 U.S. Dist. LEXIS 36694, *14 (D.N.J. Mar. 16, 2012). "New Jersey LAD claims for hostile work environment,[…] also limit liability against an employer. N.J.S.A. § 10:5-12(a). Individual employees may be held personally liable for New Jersey LAD claims under an aiding and abetting theory where a supervisory employee aids and abets an employer's violation of the Act. N.J.S.A. § 10:5-12(e); *Hurley v. Atlantic City Police Dept.*, 174 F.3d 95, 125-26 (3d Cir. 1999)." *Id.* at *15. Here, Plaintiff has not specifically pled an aiding and abetting theory and therefore the New Jersey LAD claim against individual defendants must be dismissed.

Thus, the only remaining Counts at this time are Count I and Count III for retaliation and hostile work environment against the County and individual Defendants, specific to the events surrounding Plaintiff's application, interview, and rejection for the Crew Supervisor Position.

Count II is dismissed at this time.

## ORDER

THIS MATTER having been opened to the Court by Defendants' motions for summary judgment (*see* ECF No. 35, 36, 38, 43); and the Court having fully considered the submissions in support thereof, and any opposition thereto; and having considered the arguments of counsel; and for good cause shown;

IT IS on this 19th day of March, 2018,

**ORDERED** that Defendant Monmouth County Building and Grounds' motion for summary judgment (*see* ECF 36) is granted in part and denied in part; and it is further;

**ORDERED** that Defendant Krzyanowski's motion for summary judgment (*see* ECF 43) is granted in part and denied in part; and it is further;

**ORDERED** that Defendant Compton's motion for summary judgment (*see* ECF 35) is granted in part and denied in part; and it is further;

**ORDERED** that Defendant Bell's motion for summary judgment (*see* ECF 38) is granted in part and denied in part; and it is further;

**ORDERED** that Count II of the Complaint is dismissed; it is further;

**ORDERED** that Plaintiff's motion for leave to file a Sur-Reply (ECF No. 53) is denied as moot.

*s/Peter G. Sheridan*_____
PETER G. SHERIDAN, U.S.D.J.